# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

**LEE TWAN DILLARD**                                                                          **PLAINTIFF**

**V.**                          **NO. 2:16CV00155 DPM-JTR**

**NANCY A. BERRYHILL,**
**Deputy Commissioner for Operations,**
**performing the duties and functions not reserved**
**to the Commissioner of Social Security**                          **DEFENDANT**

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to United States District Judge D. P. Marshall, Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objections; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## I.  Introduction

Plaintiff, Lee Twan Dillard ("Dillard"), initially applied for disability and supplemental security income benefits on June 27, 2007, alleging an onset date of April 1, 2007. (Tr. at 16, 110-113). After conducting a hearing, the Administrative Law Judge ("ALJ") denied the application on October 20, 2009. (Tr. at 16-30).

Dillard appealed to the Social Security Appeals Council ("Appeals Council").

(Tr. at 11). On March 1, 2010, while his administrative appeal was still pending, he filed a second application for disability and supplemental security income benefits. (Tr. at 738-748).

On June 30, 2011, the Appeals Council denied Dillard's appeal of the ALJ's October 20, 2009 decision. (Tr. at 1). On August 25, 2011, Dillard filed an appeal to this Court challenging the ALJ's now final decision. *Dillard v. Astrue*, Case No. 2:11CV00150-JTR (E.D. Ark., Aug. 27, 2012).

On October 24, 2011, the same ALJ who denied Dillard's first application for benefits entered a decision denying benefits on Dillard's second application. (Tr. at 522). Dillard requested review by the Appeals Council. (Tr. at 520).

On August 27, 2012, the Court entered an order reversing and remanding the ALJ's October 20, 2009 decision because he failed to consider the medical opinion of Dr. Ahilesh Rao. (Tr. at 178, 476). The Court noted that the last page of Dr. Rao's report, which imposed significant limitations on Dillard's ability to walk and lift, was included but misfiled in the record at page 178. In his decision, the ALJ had *erroneously stated* that, because this page was *missing* from the record, it prevented him from considering Dr. Rao's medical opinion. (Tr. at 476).

On December 13, 2012, the Appeals Council *combined Dillard's two applications for benefits and remanded the consolidated case*, in its entirety, for a third administrative hearing. (Tr. at 520-524). The Appeals Council found that the

ALJ had erred, in denying Dillard's second application for benefits, by failing to consider Dr. Lee Waddy's assignment of moderate limitations on Dillard's ability to stand and walk. (Tr. at 535). Thus, *both* this Court *and* the Appeals Council took issue with the ALJs' failure to assess functional limitations contained in medical source statements in *both* of Dillard's pending applications for benefits.

After conducting a third administrative hearing, in July 2013, the *same ALJ* again found Dillard was not disabled, (Tr. at 554), and issued two virtually identical opinions, dated August 16, 2013 (Tr. at 537) and September 11, 2013 (Tr. at 555).[1] In those decisions, the ALJ considered the medical opinions of Dr. Rao and Dr. Waddy, both of whom assigned moderate physical limitations (Tr. at 552),[2] and concluded that Dillard: (1) could perform work at the sedentary level (with certain postural limitations); and (2) could understand, remember, and carry out simple instructions. (Tr. at 533, 550). Dillard sought relief from the Appeals Council.

On November 9, 2015, the Appeals Council remanded the consolidated action because: (1) the ALJ did not combine both of Dillard's applications, as it had ordered him to do; (2) the same ALJ had heard and rejected *all* of Dillard's applications for benefits; and (3) the ALJ had not considered Dillard's request to postpone the third

---

[1] As the Appeals Council later noted, by issuing two separate opinions, in what was supposed to be a *consolidated case*, the ALJ ignored its order to consolidate Dillard's applications for benefits.

[2] Dr. Rao assigned moderate limitations on Dillard's ability to walk and lift. (Tr. at 476). Dr. Waddy assigned moderate limitations on Dillard's ability to stand and walk. (Tr. at 1014).

administrative hearing. (Tr. at 571).

On June 28, 2016, a new ALJ conducted a fourth administrative hearing on Dillard's consolidated applications for benefits. (Tr. at 405). In a decision dated July 27, 2016, the ALJ found that, based on Dillard's deteriorating medical conditions over the relevant time-period, he *was now disabled*, as of October 26, 2015. (Tr. at 405-418).[3]

Dillard has appealed the Commissioner's decision to this Court, where he argues that the ALJ erred in finding that he was not disabled earlier than the disability onset date of October 26, 2015.[4]

For the reasons explained below, the Court recommends that the ALJ's decision be reversed and remanded for further review.

## II. Discussion

In his decision, the ALJ found that: (1) Dillard had not engaged in substantial gainful activity since the date he alleged he became disabled, April 1, 2007 (Tr. at 405, 407); (2) Prior to October 26, 2015 (the date the ALJ held that Dillard's disability began), his severe impairments included degenerative disc disease of the cervical and lumbar spine, degenerative joint disease in the knees, chest pain, and

---

[3] Because Dillard did not seek review by the Appeals Council, the ALJ's decision became the *final decision* of the Commissioner.

[4] Rather than specifying this "earlier date," Dillard argues only that it should have been "sometime" before October 26, 2015. (Doc. No. 10).

*major depressive disorder*, *Id.;* (3) Prior to October 26, 2015, Dillard's impairments did not meet or equal a listed impairment, (Tr. at 408); and (4) Prior to October 26, 2015, Dillard had the residual functional capacity (ARFC@) to perform a limited range of sedentary work, that was subject to the following restrictions: He could only occasionally stoop, crouch, crawl, kneel, or balance; He must avoid exposure to respiratory irritants, *Id.*; He would require the use of a cane in his dominant upper extremity to ambulate away from his workstation, *Id.*; He could perform work where interpersonal contact was incidental to the work performed, *Id.*; and, He could perform work where the complexity of tasks could be learned by demonstration or repetition within 30 days, the tasks contain few variables and require little judgment, and the supervision required would be simple, direct, and concrete. *Id.*

Based on Dillard's RFC, the ALJ concluded that he could not perform his past relevant work. (Tr. at 417). However, relying upon the testimony of a Vocational Expert ("VE"), the ALJ found that, *before* October 26, 2015, Dillard's age, education, work experience and RFC allowed him to perform other jobs that existed in significant numbers in the national economy, including positions as a circuit board assembler and document preparer. *Id.* Thus, the ALJ held that Dillard was *not* disabled, *prior to* October 26, 2015. (Tr. at 418).

A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

B. Dillard=s Arguments on Appeal

Dillard contends that substantial medical evidence does not support the ALJ=s determination of the date of onset of his disability. According to Dillard, if the ALJ had properly considered all of the medical evidence, the onset date would have been

earlier than October 26, 2015. Specifically, he argues that: (1) the ALJ erred in determining that the onset date of Dillard's disability was October 26, 2015; (2) the ALJ erred in relying on his "lay" evaluation of Dillard's impairments, rather than obtaining the opinion of a consulting medical expert, who was essential to the accurate evaluation of Dillard's severe limitations which impacted the date of onset of his disability; and (3) reversal is required because the administrative record was incomplete.[5]

Dillard was involved in three car wrecks between 2006 and 2010. In 2006, Thomas Hayde, D.C., Dillard's treating chiropractor, found Dillard capable of light work, but decided to restrict him from work activity due to pain in his back. (Tr. at 227-233, 245). In January 2007, an MRI of the left knee showed a small joint effusion and bone bruising. (Tr. at 1100-1111). At physical therapy appointments, range of motion was found to be normal. (Tr. at 1101-1102). Home exercise was suggested. *Id.*

On April 12, 2007, Dr. Hayde opined that Dillard's neck, knee, and chest injuries were permanent and painful. (Tr. at 295). An x-ray of Dillard's cervical spine in May 2007 was normal. (Tr. at 214). Later that same month, Dillard's chiropractor stated that he anticipated Dillard would require no further treatment.

---

[5] After Dillard filed his Appellant Brief, the Commissioner provided the additional documents needed to complete the administrative record. (Doc. No. 15, 19). Thus, Dillard's third argument is now moot.

(Tr. at 237).

After a car wreck in May 2007, x-rays of Dillard's cervical, thoracic, and lumbar spine showed chiropractic subluxations, moderate loss of the cervical lordosis, and abnormal joint mobility at multiple levels. (Tr. at 255). Dillard engaged in physical therapy for those injuries. (Tr. at 253). Because he was not progressing well, as of June 2007, Dr. Hayde told Dillard to stop work. (Tr. at 242).

In 2007, non-examining reviewing physicians found Dillard capable of medium work. (Tr. at 310, 313). The ALJ gave these opinions little weight, finding that subsequent evidence further restricted Dillard. (Tr. at 416).

Dr. Rao examined Dillard on August 22, 2007, and found normal straight-leg raise, decreased motion in the cervical and lumbar spine, and an antalgic gait. (Tr. at 178, 279-285). As explained previously, the final page of Dr. Rao's report listed moderate limitations in walking and lifting. (Tr. at 178). While this page was filed out of sequence, *it was in the record at page 178*, a filing error the Court specifically called to the ALJ's attention in its August 27, 2012 decision. (Tr. at 178; *Dillard v. Astrue*, Doc. No. 12, Case No. 2:11CV00150-JTR (E.D. Ark., Aug. 27, 2012).

Nevertheless, the new ALJ erroneously stated in his June 28, 2016 decision that, because page 178 was not in the record, Dr. Rao's opinion was entitled to no weight. (Tr. at 415). *This was the same error committed by the previous ALJ in 2009*, which led this Court to reverse and remand the case on August 27, 2017. (Tr. at 473-

478).

Importantly, in 2013, after the prior ALJ *properly considered* Dr. Rao's medical report (including page 178), he concluded that Dillard was capable of sedentary work. (Tr. at 535. 550). That is the *same exertional level* the current ALJ assigned to Dillard, without giving Dr. Rao's medical opinion any weight. (Tr. at 535).

While the ALJ erred in giving Dr. Rao's medical opinion no weight, based on the erroneous finding that the last page of his report was "missing," he properly concluded, based on *other* substantial medical evidence in the record, that Dillard was capable of performing a reduced range of sedentary work.[6] (Tr. at 408). Because sedentary work is the *lowest exertional level*, and because the ALJ relied on other substantial medical evidence in the record to support that physical RFC determination, the Court concludes that this mistake by the current ALJ is " harmless error."

---

[6] The current ALJ relied on the medical opinion of Dr. Waddy, in May 2010, to place moderate limitations on Dillard's ability to walk and stand. These moderate limitations were very similar to the ones assigned by Dr. Rao in his August 24, 2007 report. (Tr. at 178, 1014). During Dr. Waddy's consultative examination, he found positive straight-leg raise, guarding, muscle weakness, and he noted that Dillard walked slowly with a cane. (Tr. at 1011-1015). He diagnosed Dillard with cervical disc syndrome, lower back syndrome, chest wall pain, a history of spastic colon, and traumatic arthritis in the knees. *Id*. An April 2010 cervical x-ray showed mild disc space narrowing, with mysofascial strain. (Tr. at 1003-1004). A lumbar x-ray showed straightening of the lumbar lordosis. *Id*. In late 2014 and 2015, Dillard had several visits to his PCP, where he did not complain of back or neck pain. (Tr. at 1241-1254). However, MRIs of the cervical and lumbar spine, in December 2015, showed desiccation, disc bulge, canal and foraminal stenosis, and hypertrophy. (Tr. at 1258-1262). Dillard was prescribed a walker in April 2016. (Tr. at 1222).

With regard to Dillard's mental RFC, he received no care or treatment prior to being examined by a consulting psychologist, Dr. Kenneth Jones, in August 2010. (Tr. at 1029-1033). Dr. Jones found that Dillard had no limitations in adaptive functioning or communication. (Tr. at 1032). He thought that Dillard was malingering and that his negative attitude could keep him from completing work tasks. (Tr. at 1033). A state-agency reviewing psychologist used Dr. Jones' report as his basis for concluding, in September 2010, that Dillard's mental impairments were not severe. (Tr. at 1040).

In April 2013, Dillard began *regular psychiatric treatment* at Mid-South, where his intake diagnosis was "major depressive disorder." (Tr. at 1064-1077). He reported feeling anxious and angry every day, and he endorsed suicidal ideation. (Tr. at 1064). He continued to receive consistent mental health treatment and seemed to be making progress in therapy. (Tr. 1064-1077). However, in August 2013, Dillard entered The Bridgeway psychiatric facility in North Little Rock, where he was hospitalized for five days to receive treatment for *suicidal ideation* and *homicidal ideation*. (Tr. at 1139-1143). During his stay in The Bridgeway, Dillard showed depressed mood with slowed psychomotor activity. (Tr. at 1142). He improved upon discharge. (Tr. at 1139-1143).

Dillard continued receiving mental health therapy and medication from August of 2013, through August of 2015. (Tr. at 1153-1192). At appointments in

2014 and 2015, he expressed mood swings, anxiety, and anger, and occasional thoughts of suicide. *Id.* He was compliant with medication, and he seemed willing to work on therapeutic coping skills. *Id*.

Dena Henderson, LPC, Dillard's treating therapist at Mid-South counseling clinic, completed a medical source statement and submitted a letter on Dillard's behalf in July 2013, shortly before his hospitalization in The Bridgeway. (Tr. at 1083-1091). She stated that Dillard began treatment with her in April 2013. According to Ms. Henderson, Dillard had severe depression, anxiety, feelings of hopelessness and anger, poor memory, and suicidal and homicidal ideations. (Tr. at 1083). She found persistent disturbances of mood, emotional withdrawal, and sleep disturbance. (Tr. at 1084). She explained that physical impairments impacted his mental health. (Tr. at 1086). Ms. Henderson said Dillard was compliant with treatment but may not be able to continue due to finances. (Tr. at 1089). She said he was unable to complete tasks and had a hard time interacting with others. (Tr. at 1090-1091). She said he would miss four days of work per month. (Tr. at 1087).

It is worth noting that Ms. Henderson's July 2013 evaluation of Dillard's severe mental health issues occurred about one month before he required hospitalization in the Bridgeway psychiatric facility for suicidal and homicidal ideation. Nevertheless, in the ALJ's July 27, 2016 decision, he gave Ms. Henderson's statement *no weight*. (Tr. at 416). His reason for doing so was because

she was not an acceptable treating source and her opinion was "based primarily upon the claimant's subjective reports." *Id.*

The Commissioner's regulations divide sources into acceptable medical sources and "other sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007). The "other sources" grouping includes nurse practitioners, chiropractors, licensed clinical social workers, and therapists (like Ms. Henderson). *Id.* Information from these sources "cannot establish the existence of a medically determinable impairment, but it may provide insight into the severity of the impairment and how it affects the individual's ability to function." Soc. Sec. Ruling 06-3p; *Sloan*, 499 F.3d at 888. The regulations go as far as to say that other sources may deserve more weight than an acceptable medical source based on extensive treatment, better supporting evidence, and a better explanation for the opinion. *Id.* Factors to consider are: how often the provider has seen the patient; how consistent the opinion is with other evidence; relevant supporting evidence; and whether the provider has an area of expertise related to the patient's impairment. *Id.* While she is grouped as an "other source," under the regulations, Ms. Henderson treated Dillard for a considerable period of time; her specialty was in mental health treatment; and the findings in her July 2013 letter were consistent with the similar findings of medical professionals who treated Dillard at The Bridgeway. Given those facts, the ALJ was obligated to explain *why* he believed Ms. Henderson's opinion was entitled to no weight, before

he rejected it.[7]

The medical record makes it clear that *before* October 26, 2015, the date the ALJ determined that Dillard became disabled, he had serious mental health issues related to his severe depression. Yet, during the long pendency of this case in the administrative review process, *no ALJ ever requested and obtained a Psychiatric Review Technique ("PRT") that was prepared by a properly qualified medical source*.[8] Although an ALJ is authorized under the regulations to complete a PRT (see 20 C.F.R. § 404.1520a(d)(1)(i), § 416.920a(d)(1)(i)), the statute declares that:

> In any case where there is evidence which indicates the existence of a mental impairment," an ALJ may not make an initial determination that the claimant is not disabled unless he "has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

42 U.S.C. § 421(h); *Montgomery v Shalala* 30 F.3d 98, 100-101 (8th Cir 1994).

Here, the ALJ took it upon himself to determine Dillard's degree of limitation in the four functional areas covered by the PRT, and then encapsulate *his* medical

---

[7] Certainly, Dillard's hospitalization for five days in The Bridgeway treatment facility, shortly after Ms. Henderson rendered her opinion, is strong support for the accuracy of her evaluation of the seriousness of Dillard's severe depression.

[8] The PRT rates a claimant's degree of functional mental limitation in four broad areas: activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(b)(2), (c)(2)-(4), 416.920a(b)(2), (c)(2)-(4). The PRT is used to assess the severity of a claimant's impairment at Step Two, and to determine whether he met a Listing at Step Three. *Id*.

findings in *one sentence*:[9]

> The claimant has the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 C.F.R., Part 404, Subpart P, Appendix 1: mild restriction in activities of daily living, moderate difficulties in maintaining social functions, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration.

(Tr. at 408, para 4).

Without the benefit of a properly completed PRT from a qualified medical source, there was *nothing* in the medical records to support the "lay" medical opinions expressed by the ALJ. (Tr. at 408). For example, in *2010*, Dr. Jones, a consulting psychologist, examined Dillard and found that he had minimal mental limitations. (Tr. at 1033). A state-agency reviewing psychologist later used Dr. Jones' report to conclude that Dillard had no mental impairment. (Tr. at 1040). *Three years later*, Dillard began to receive regular mental health counseling and treatment at Mid-South for anxiety and severe depression, which led to a five-day stay in The Bridgeway for suicidal and homicidal ideation. He continued to receive mental health treatment for his severe depression through August 2015. During this period of time, as documented by Dillard's treatment records from Mid-South and The

---

[9] "The claimant has the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 C.F.R., Part 404, Subpart P, Appendix 1: mild restriction in activities of daily living, moderate difficulties in maintaining social functions, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of extended duration." (Tr. at 408, para 4).

Bridgeway, he had severe mental health issues. (Tr. at 415-516). Yet, in his decision, the ALJ did not to discuss or assign *any weight* to Dr. Jones's opinion or the opinions of anyone at Mid-South and The Bridgeway, who provided mental health treatment to Dillard between 2013 and 2015. (Tr. at 415). This left nothing in the medical records to support the ALJ's lay opinion about how Dillard's mental disorders affected his functioning.

Given the protracted administrative delay in this case, it was *essential* for the ALJ to obtain a properly completed PRT, from a qualified medical source, to account for *how* Dillard's mental limitations affected his ability to perform a limited range of sedentary work. Rather than doing so, the ALJ elected to *speculate* that Dillard's depression might restrict him to jobs where: "interpersonal contact is incidental to the work performed; . . . the complexity of tasks could be learned by demonstration or repetition within 30 days; and . . . the tasks contain few variables and require little judgment, and the supervision required is simple, direct, and concrete." (Tr. at 408-409). By substituting his own lay medical opinion for those of qualified medical providers, the ALJ committed reversible error.

## III. Conclusion

An ALJ is required to order medical examinations and tests if the medical records do not provide substantial evidence to support a determination of whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)); 20

C.F.R. §§ 404.1591a(b) and 416.919a(b). Here, the ALJ was required to obtain a PRT, completed by a medical source, in order to provide the necessary medical evidence to account for how Dillard's severe depression impacted his ability to perform a limited range of sedentary work. Accordingly, the ALJ's decision should be reversed.

The Court should instruct the ALJ, on remand, to use a qualified medical source to complete a PRT form, based on all of Dillard's mental health treatment records from 2010 through October 26, 2015, and then properly support how Dillard's mental RFC affected his ability to perform a limited range of sedentary work prior to October 26, 2015. This may or may not require the ALJ to alter the previously determined onset date of Dillard's disability.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision be REVERSED and the case be REMANDED for further review.

DATED this 18th day of October, 2018.

_____
UNITED STATES MAGISTRATE JUDGE